IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

JOHN MARSHALL           )
                               )
        Plaintiff,     )
                               )
        v.          )        **Civil Action No. WGC-10-43**
                               )
MICHAEL ASTRUE       )
Commissioner of Social Security  )
                               )
        Defendant.    )
_____)

**MEMORANDUM OPINION**

Plaintiff John Marshall ("Mr. Marshall" or "Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 401-433, 1381-1383f.  The parties consented to a referral to a United States Magistrate Judge for all proceedings and final disposition.  *See* ECF Nos. 5, 7-8.[1]  Pending and ready for resolution are Plaintiff's Motion for Summary Judgment (ECF No. 14) and Defendant's Motion for Summary Judgment (ECF No. 32).  Plaintiff filed a Response to Defendant's Motion.  *See* ECF No. 33.  No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2011).  For the reasons set forth below, Defendant's Motion for Summary Judgment will be granted and Plaintiff's Motion for Summary Judgment will be denied.

---

[1] The case was subsequently reassigned to the undersigned.

1. **BACKGROUND**

On May 15, 2006 Mr. Marshall protectively filed applications for DIB[2] and SSI alleging a disability onset date of April 1, 2005 due to diabetes, arthritis, high blood pressure and high cholesterol. *See* R. at 125-30, 131-36, 161. Mr. Marshall's applications were denied initially on August 31, 2006. R. at 93-96, 97-100. On October 3, 2006 Mr. Marshall requested reconsideration, R. at 103, and on February 23, 2007 the applications were denied again. R. at 104-05, 106-07. Thereafter Mr. Marshall requested a hearing before an Administrative Law Judge ("ALJ") which the Social Security Administration acknowledged receiving in the letter of November 7, 2007. R. at 108-12. On April 7, 2008 an ALJ convened a hearing. R. at 25-87. Mr. Marshall was represented by counsel at this hearing. The ALJ obtained testimony from Mr. Marshall and a vocational expert ("VE"). In the May 29, 2008 decision the ALJ found Mr. Marshall is not disabled within the meaning of the Act. R. at 24. Mr. Marshall thereafter requested a review of the hearing decision. R. at 88. On November 12, 2009 the Appeals Council denied Mr. Marshall's request for review, R. at 1-3, thus making the ALJ's determination the Commissioner's final decision.

2. **ALJ's Decision**.

The ALJ evaluated Mr. Marshall's claims for DIB and SSI using the sequential evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920. Mr. Marshall bears the burden of demonstrating his disability as to the first four steps. At step five the burden shifts to the Commissioner. If Mr. Marshall's claims fail at any step of the process, the ALJ does not advance to the subsequent steps. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). At step one the ALJ

---

[2] Mr. Marshall "has acquired sufficient quarters of coverage to remain insured through December 31, 2010." R. at 9. *See also* R. at 157.

found Mr. Marshall has not engaged in substantial gainful activity since April 1, 2005, the alleged onset date of disability. R. at 11. The ALJ concluded at step two that Mr. Marshall's cervical degenerative disc disease, right hand contracture, diabetes mellitus, obesity, and arthritis of the knees and shoulder are severe impairments. *Id.* at 12. The ALJ further found at step two that the medical records did not support as severe impairments Mr. Marshall's hypertension, vision loss, depression and headache. *Id.* at 14-16.

In accordance with 20 C.F.R. §§ 404.1520a, 416.920a, the ALJ followed a special technique to evaluate the severity of Mr. Marshall's depression. The four broad functional areas ((1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace and (4) episodes of decompensation) are known as the "paragraph B" criteria for most of the mental disorders listed in Appendix 1. The ALJ determined Mr. Marshall has a *mild* limitation in the area of activities of daily living ("all of [Mr. Marshall's] activities of daily living limitations are related to his physical impairments not his mental impairments."), R. at 15, a *mild* limitation in the area of social functioning (the ALJ noted Mr. Marshall drives to perform simple errands such as taking and picking up his stepson from school and socializing with friends and neighbors), *mild* limitation in the area of concentration, persistence or pace and *no* episodes of decompensation. "Because the claimant's medically determinable mental impairment causes no more than 'mild' limitation in any of the first three functional areas and 'no' limitation in the fourth area, it is nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1))." *Id.*

Having completed the special technique for evaluating Mr. Marshall's depression, the ALJ resumed the sequential evaluation process. At step three the ALJ determined Mr. Marshall does not have an impairment or combination of impairments that meets or medically equals

the criteria of any of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ considered Listings 1.00 *et seq.* (musculoskeletal disorders), 9.00 *et seq.* (endocrine system disorders) and 12.00 *et seq.* (mental health disorders).  Specifically the ALJ found Mr. Marshall did not meet Listing 1.02[3] because (a) Mr. Marshall does not have "a contracture of one major peripheral weight bearing joint resulting in the inability to ambulate" and (b) "does not have extreme loss of function in both [upper] extremities. . . ."  R. at 17.  Regarding Listing 9.08[4] for Mr. Marshall's diabetes mellitus, the medical records fail to establish Mr. Marshall has neuropathy[5] established in two extremities, or has experienced acidosis[6] or has been diagnosed with retinitis[7] proliferans.[8]  *Id.*

---

[3]  1.02 *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
   A.  Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
   or
   B.  Involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

[4] 9.08 *Diabetes mellitus.*  With:
   A.  Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or
   B.  Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or $PCO_2$ or bicarbonate levels); or
   C.  Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

[5]  "[A] general term denoting functional disturbances and/or pathological changes in the peripheral nervous system."  *Dorland's Illustrated Medical Dictionary* 1131 (27th ed. 1988).

[6]  "[A] pathologic condition resulting from accumulation of acid or depletion of the alkaline reserve (bicarbonate content) in the blood and body tissues, and characterized by an increase in hydrogen ion concentration (decrease in pH)."  *Id.* at 17.

[7]  "[I]nflammation of the retina; used in the older ophthalmological literature to denote impairment of sight, perversion of vision, edema, and exudation into the retina, and occasionally by hemorrhages into the retina."  *Id.* at 1456.

Next the ALJ determined Mr. Marshall's residual functional capacity ("RFC"). The ALJ found Mr. Marshall can perform sedentary work, as defined in the Regulations, except "he could lift 20 pounds occasionally, 10 pounds frequently[9], sit for 6 hours in an 8 hour period, stand or walk for 2 hours in an 8 hour period with occasional balancing, crouching, kneeling, stooping, climbing a ramp or stairs but never could climb a ladder, rope or scaffold and only frequent pushing and pulling in the upper extremities and only occasional handling, fingering and feeling with the right dominant hand." R. at 18. At step four the ALJ found Mr. Marshall is unable to perform any of his past relevant work as a delivery driver[10], a janitor, a factory mechanic or a frame shop foreman. *Id.* at 22.

Finally, at step five, the ALJ considered Mr. Marshall's age (48 years old at the hearing and 45 years old on the alleged onset date of disability – defined as a younger individual between the ages of 18-49), education (eighth grade; limited and able to communicate in English), past work experience (transferability of job skills is not material) and his RFC

---

[8] Retinitis proliferans means "a condition sometimes resulting from intraocular hemorrhage, with neovascularization and the formation of fibrous tissue bands extending into the vitreous from the surface of the retina; retinal detachment is sometimes a sequel." *Id.*

[9] Per the Social Security Regulations, sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a) (2008). The physical exertional limitation with lifting and carrying as defined by the ALJ meets the definition of light work. *See id.* §§ 404.1567(b), 416.967(b). "If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

[10] At the April 7, 2008 hearing the ALJ asked the vocational expert whether a hypothetical person, the same age, educational background and work history as Mr. Marshall, with a residual functional capacity at the light exertional level and certain limitations, would be able to perform any of Mr. Marshall's past relevant work. The vocational expert testified, "Yes. The position as a delivery driver does not require full-time use of handling, fingering, and feeling it is more intermittent as a waiting for a run to occur. The other positions certainly not they're way too strenuous." R. at 83. In her decision the ALJ noted "that a representative job in the driver category (Driver – DOT code 919.683-014) requires frequent handling and fingering. The job identified by the vocational expert exceeds [Mr. Marshall's] residual functional capacity as assigned. Accordingly, [Mr. Marshall] is unable to perform past relevant work." *Id.* at 22.

(sedentary work with certain limitations). The ALJ found the Social Security Administration met its burden of proving Mr. Marshall is capable of performing other work[11] that exists in significant numbers in the national economy, relying on the testimony of the VE. R. at 23, 84. Accordingly, the ALJ concluded that Mr. Marshall is not disabled within the meaning of the Act. R. at 24.

3.   **Standard of Review**.

The role of this Court on review is to determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Pass v. Chater*, 65 F.3d at 1202; *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla, but less than a preponderance, of the evidence presented, *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (citations omitted), and it must be sufficient to justify a refusal to direct a verdict if the case were before a jury. *Hays*, 907 F.2d at 1456. This Court cannot try the case *de novo* or resolve evidentiary conflicts, but rather must affirm a decision supported by substantial evidence. *Id.*

---

[11] Systems security monitor.

4.    **Discussion**.

A.    *Alleged Failure to Consider Listing 1.04A*

Plaintiff argues the ALJ committed reversal error by failing to consider Listing 1.04A at step three.  Among the severe impairments found at step three was cervical degenerative disc disease.  The Regulations describe Listing 1.04A as follows:

> *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
>
> With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

Plaintiff argues the medical records clearly show evidence of spinal stenosis[12] resulting in compromise of a nerve root.  ECF No. 33-1 at 4.  In short Plaintiff contends his condition meets or medically equals Listing 1.04A.

By way of background, before the alleged onset date of disability (April 1, 2005), Mr. Marshall was involved in a motor vehicle accident on November 10, 2004.  He was taken to the emergency room where X-rays and CT scans were taken.  He was released.  He subsequently returned to the emergency room complaining of neck pain, lower back pain and occasional headaches.  He was given medication but stopped taking them because they made him feel uncomfortable.  Mr. Marshall was unable to return to work since the motor vehicle accident.

---

[12]  "[N]arrowing or stricture of a duct or canal."  *Dorland's Illustrated Medical Dictionary* 1579.

His doctor, Vinodrai Mehta, M.D., referred him to the Orthopedic Center.  R. at 208-09.  Mr. Marshall was physically examined and X-rays and MRIs were taken.  The MRI of the cervical spine revealed Mr. Marshall "does have degenerative disc changes with disc protrusion and osteophyte complex at C4-5 causing moderate stenosis.  He also has some foraminal narrowing on the right side at C3-4 and C4-5 but no significant cord abnormalities were noted." *Id.* at 208.  The radiologist formed two impressions:  "1. Cervical strain with underlying degenerative disc disease, particularly at C4-5.   2.   Lumbosacral strain with mild degenerative lumbar spine disease." *Id.* at 209.

Approximately two years later, at the request of Dr. Mehta, another MRI of Mr. Marshall's cervical spine was taken.  The radiologist compared the results of the new test, taken on October 11, 2006, with the previous results of November 18, 2004.  In reviewing the most recent MRI, the radiologist formed the following impressions:

> 1.  There is a new moderate-sized focal disc osteophyte protrusion seen to the left at the C6-C7 in the subarticular region narrowing the left C6-C7 foramen and impinging on the exiting nerve root.
>
> 2.  There are small central disc osteophyte protrusions at the C4-C5 and C5-C6 levels compared to previous exams.
>
> 3.  Stable narrowing of the right C3-C4 and C4-C5 neural foramen by uncovertebral spurs.

*Id.* at 312.

Mr. Marshall continued to complain about his neck pain and Dr. Mehta ultimately referred Mr. Marshall to Dr. Wolinsky, an orthopedic surgeon.  Mr. Marshall saw Dr. Wolinsky on May 14, 2007.  After obtaining a medical history, reviewing the medical records and conducting an examination, Dr. Wolinsky determined Mr. Marshall "has had weakness in his

right upper extremity starting in 2006, with spinal cord compression secondary to disc herniation at C6-7 with cervical cord stenosis at C4-5 and C5-6." *Id.* at 352. Dr. Wolinsky discussed treatment options with Mr. Marshall, specifically conservative treatment versus surgical intervention. Mr. Marshall elected to have surgery.

A month later, June 14, 2007, Mr. Marshall underwent surgery consisting of (a) C4-5 anterior cervical discectomy[13], (b) C5-6 anterior cervical discectomy, (c) C6-7 anterior cervical discectomy and (d) decompression of the spinal cord at C4-5, C5-6 and C6-7. *Id.* at 353. The surgery proceeded without any complications. *Id.* at 355. Mr. Marshall was discharged from the hospital on June 17, 2007. *Id.* at 394. Mr. Marshall had follow-up appointments with Dr. Wolinsky on July 5, 2007, August 9, 2007, October 11, 2007 and January 24, 2008. *Id.* at 385, 390-92.

With the first follow-up appointment post-surgery, Dr. Wolinsky made the following assessment: "I think he is doing very well from neurological perspective and I have discussed with him that with myelopathy[14] and spinal cord compression, that it can take up to a year for the maximum improvement after this. As far as his pain is concerned, he has also low back pain and I have discussed with him that after he recovers from his cervical operation, I would like to further investigate his lower back pain and start some pain management for that. At this time, I feel that we should concentrate on the cervical spine." *Id.* at 392.

Approximately a month later, Mr. Marshall saw Dr. Wolinsky for continued post-surgery check-up and evaluation. Dr. Wolinsky made the following assessment: "At this time, I think he

---

[13] "[E]xcision of an intervertebral disk." *Dorland's Illustrated Medical Dictionary* 495.

[14] "1. a general term denoting functional disturbances and/or pathological changes in the spinal cord; the term is often used to designate nonspecific lesions, in contrast to inflammatory lesions (myelitis). 2. pathological changes in the bone marrow." *Dorland's Illustrated Medical Dictionary* 1088.

is doing very well and has continued to improve.  I discussed with him that it can take up to a year for his myelopathy to improve as much as it will.  If he does fail to improve or if he levels off or worsens in the future than we will consider MRI imaging, but as he keeps improving I would not do this at this time."  *Id.* at 391.

During the October 11, 2007 follow-up appointment Dr. Wolinsky noted Mr. Marshall's strength "is actually significantly improved."  *Id.* at 390.  Dr. Wolinsky seemed most concern about the contracture of Mr. Marshall's right upper extremity.  Dr. Wolinsky made a passing reference to Mr. Marshall's neck, wanting to have X-rays taken of the cervical spine "to evaluate the instrumentation and progress of fusion."  *Id.*

Mr. Marshall's last appointment with Dr. Wolinsky, prior to the April 5, 2008 hearing, was on January 24, 2008.  Dr. Wolinsky noted Mr. Marshall's strength is significantly improved. There are references to Mr. Marshall's contractures of the right upper extremity.  Dr. Wolinsky concludes his notes with the following: "and we will obtain another MRI scan of cervical spine just to verify indeed that his spinal cord is completely decompressed.  I feel that as his neurologic situation has improved, I do not feel that it will show any significant change although I do think it is warranted to verify indeed that there is no further compression in this region." *Id.* at 385.

Plaintiff argues that his cervical spine disorder meets or equals Listing 1.04A and the ALJ failed to explain why she did not specifically consider this listing.  "Even assuming, *arguendo*, that the criteria therein were not satisfied, given the fact that no state agency examiner had the benefit of the notes from John Hopkins Medicine, it was incumbent upon [the ALJ] to seek an opinion from one of the Defendant's medical consultants as to whether Listing 1.04A was

equaled."  ECF No. 14-2 at 25.  Plaintiff fails to articulate what information from the John Hopkins Medicine's notes indicates an updated medical judgment as to medical equivalence is required.

In Plaintiff's Response to Defendant's Motion for Summary Judgment, Plaintiff refers to the MRI of October 11, 2006 indicating issues with Mr. Marshall's cervical spine.  Plaintiff rejects Defendant's characterization that the MRI's findings were essentially normal.  "As required by Listing 1.04, they evidence spinal stenosis resulting in compromise of a nerve root. Additionally, the findings by Dr. Jean-Paul Wolinsky clearly evidenced satisfaction of the other criteria required in Listing 1.04 (Tr. 351-52 and Pl.'s Br. at p. 23)."  ECF No. 14-2 at 25.  The Court notes the MRI of October 11, 2006 was taken **before** the C4-C5, C5-C6, C6-C7 anterior cervical discectomy infusion and decompression of the spinal cord at C4-C5, C5-C6, C6-C7 on June 14, 2007.  Additionally, Dr. Wolinsky's findings, on pages 351 and 352 of the transcript, concern Mr. Marshall's appointment of May 14, 2007, a month **before** the June 14, 2007 surgery.

Ten days after the April 7, 2008 hearing Mr. Marshall's counsel provided the ALJ with the most recent medical records including "a discharge summary and clinic notes from Jean-Paul Wolinsky, M.D. at John Hopkins Hospital regarding the cervical fusion surgery and follow up after the surgery, which are dated from June 17, 2007 through January 24, 2008. . . ."  R. at 405.  There are no findings in the most recent clinic note of January 24, 2008 of any conditions meeting or medically equivalent to Listing 1.04A.  The Court finds substantial evidence supports the ALJ's determination.

B.    *Alleged Failure to Consider Effects of Obesity*

Plaintiff argues, in light of Mr. Marshall's documented history of morbid obesity, consistent with Social Security Ruling ("SSR") 02-01p[15], the ALJ should have found Mr. Marshall's obesity medically equals a listing.  Plaintiff contends the ALJ failed to consider the effects of Mr. Marshall's obesity, exemplified by boilerplate language added to the decision, specifically,

> The claimant has been diagnosed with obesity.  SSR 02-1p recognizes that obesity is a medically determinable impairment and that its effects must be considered when evaluating disability claims, since the effects of obesity in combination with other impairments can be greater than the effects of each impairment considered separately.  Thus, any additional and cumulative effects of the claimant's obesity have been considered in assessing the claimant's impairments under each step of the sequential evaluation process.  In this instance, the undersigned has reviewed any connection between the claimant's obesity and her [sic] physical impairments and factored in the effects accordingly.

R. at 13.

Plaintiff cites the musculoskeletal report of Seth Tuwiner, M.D., as illustrative of the ALJ's failure to consider the effects of obesity.  During this August 18, 2006 examination Dr. Tuwiner noted Mr. Marshall is 5 feet, 11 inches tall and weighs 310 pounds.  *Id.* at 278.  Under *Diagnoses*, Dr. Tuwiner made repeated references to Mr. Marshall's obesity, for instance, "claimant has long-standing history of diabetes which is partly related to his morbid obesity" and "I attribute his arthritis, most likely, to his obesity."  *Id.* at 279.  Dr. Tuwiner noted Mr. Marshall's prognosis for arthritis is poor given his obesity "however, if he were to lose weight, his symptoms would be improved."  *Id.*

---

[15] *Titles II and XVI: Evaluation of Obesity*, SSR 02-01p, 2000 WL 628049 (Sept. 12, 2002).

At the April 7, 2008 hearing the ALJ inquired about Mr. Marshall's weight.

> Q:     And how tall are you?
>
> A:     5' 11''.
>
> Q:     And approximate weight today?
>
> A:     Two eighty-five.
>
> Q:     And is your weight stable or have you been gaining, losing?
>
> A:     I've lost about 15 pounds in the last six months.
>
> Q:     All right.  And are you trying to lose weight?
>
> A:     Yes, ma'am.

R. at 32.  The ALJ noted these facts in the decision.  "At the hearing, [Mr. Marshall] testified that he is five feet eleven inches tall and weigh[]ed 285 pounds, giving him a BMI of 39.7, placing him in the obese category."  R. at 14.

There are chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems that obesity may cause or complicate.  *See SSR 02-01p*, 2000 WL 628049, at *3 (Sept. 12, 2002).  The record shows Mr. Marshall has been diagnosed with multiple conditions including hypertension, diabetes and arthritis of the shoulder and the knees.  The ALJ found Mr. Marshall's hypertension non-severe because it is generally controlled by medication.  R. at 14. The other conditions were found to be severe.

As required by SSR 02-01p[16] the ALJ accepted Dr. Tuwiner's diagnosis of obesity. Dr. Tuwiner expressed concern about the impact of Mr. Marshall's morbid obesity on his arthritis. But noted, "if he were to lose weight, his symptoms would be improved." R. at 279.

The ALJ found Mr. Marshall's obesity a severe impairment at step two. *See id.* at 12. In determining Mr. Marshall has the capacity to perform sedentary work, the ALJ specifically considered the residual effects of Mr. Marshall's "cervical degenerative disc disease following his surgery and his arthritis of the knees and shoulder. . . ." R. at 19. The ALJ noted "Dr. Tuwiner concluded that [Mr. Marshall's] arthritis was related to his obesity. . . ." *Id.* at 20. By specifically considering the limitations and effects of Mr. Marshall's arthritis, which is related to Mr. Marshall's obesity, the ALJ considered Mr. Marshall's obesity.

Having reviewed the record the Court finds the ALJ considered Mr. Marshall's activities of daily living, as well as Mr. Marshall's severe and non-severe impairments (as supported by medical evidence) and determined the scope of Mr. Marshall's RFC incorporating the effects of those impairments including obesity. Substantial evidence supports the ALJ's determination.

C.     *Alleged Failure to Correctly Evaluate Mental Impairment*

Plaintiff raises multiple errors regarding the evaluation of Mr. Marshall's mental impairment: (a) failure to consider the GAF of 51 the preceding year as opined by Ms. Dudley, (b) misidentifying Ms. Dudley as a LCSW (Licensed Clinical Social Worker), instead of a LGSW (Licensed Graduate Social Worker), (c) not assigning greater weight to Ms. Dudley's opinion, (d) failure to consider Dr. Malayeri's GAF rating of 45 and (e) failure to recognize, as opined by Ms. Dudley, that Mr. Marshall's depression can be expected to last at least 12 months.

---

[16] "[W]e will accept a diagnosis of obesity given by a treating source or by a consultative examiner." *SSR 02-01p*, 2000 WL 628049, at *3.

The Court begins with the weight the ALJ accorded to Ms. Dudley's opinion. At step two of the sequential evaluation process the ALJ considered the evidence in the record regarding Mr. Marshall's depression.

> Patty Dudley, LCSW, the claimant's treating therapist, had her first visit with the claimant on July 2, 2007 (Exhibit 21F). On September 5, 2007, after one session, she diagnosed the claimant with major depression and adjustment disorder and indicated a Global Assessment of Functioning (GAF) score of 60. Ms. Dudley further concluded that the claimant had a marked restriction in activities of daily living, an extreme limitation in social functioning and he was often limited in maintaining attention and concentration with continual episodes of decompensation.

> On July 2, 2007, Ms. Dudley noted the claimant's long history of depression and that his inability to provide income was a constant source of frustration. Ms. Dudley opined that if the claimant were to receive disability income that it would enable him to provide for his family and deal with his depression.

> *                                    *                                    *

> Under Social Security regulations, Ms. Dudley, as a licensed clinical social worker, is not an acceptable medical source (20 CFR 404.1513(d) and 416.913(d)). After acknowledging the expansion in treatment by medical sources that do not fall under the acceptable medical source standard, the agency promulgated SSR 06-03p to address situations when non-acceptable sources provided ongoing care to claimants and subsequently issued an opinion in support of a disability claim.

> According to SSR 06-03p, to consider whether Ms. Dudley's opinion can be accepted and outweigh other acceptable medical source opinions, the following factors must be reviewed:

> - How long the source has known and how frequently the source has seen the individual;

> - How consistent the opinion is with other evidence;

> - The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s), and

- Any other factors that tend to support or refute the opinion.

After reviewing the factors under SSR 06-03p, the undersigned concludes that Ms. Dudley's opinion should be given little weight. Ms. Dudley formed her opinion after only two treatment sessions with the claimant. Further, the claimant had been prescribed mental medications but had only been seen by mental health professionals for two months to allow for adjusting those medications. Treatment notes describing the claimant's response to medications prescribed by his psychiatrist have not been submitted for review. Therefore, it is not possible to determine from the medical record whether Ms. Dudley's analysis of the claimant's mental impairments was rendered during a period of optimal medication adjustment. Further, Ms. Dudley's opinion that receiving disability income would allow the claimant to begin resolving his depression is not a recognized basis for awarding disability benefits under Social Security laws and regulations.

R. at 14-15, 16.

The ALJ misidentifying Ms. Dudley as a LCSW, versus a LGSW, is irrelevant to the issue of acceptable medical sources and non-acceptable medical sources. Under Social Security Regulations acceptable medical sources include licensed or certified psychologists. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2008). Neither a LCSW nor a LGSW is considered an acceptable medical source.

Second, Ms. Dudley's frequency of treating Mr. Marshall is not significant. As the ALJ noted Ms. Dudley first saw Mr. Marshall on July 2, 2007 and, based on the September 5, 2007 visit, assessed Mr. Marshall's current GAF as 60 and as 51 at the highest level in the previous year. R. at 374. This assessment by Ms. Dudley "cannot establish the existence of a medically

determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose." *SSR 06-03p*[17], 2006 WL 2329939 at *2 (Aug. 9, 2006). The acceptable medical source is M. Malayeri, M.D. The focus of Dr. Malayeri's records is prescribing medication. R. at 395-99. On the Physician Treatment Progress Notes of February 6, 2008 and February 13, 2008 Dr. Malayeri marked the box "med check" as the reason for Mr. Marshall's visits. *Id.* at 396-97. As the ALJ noted Dr. Malayeri's treatment notes do not describe Mr. Marshall's response to prescribed medication thus not allowing the ALJ to evaluate Ms. Dudley's non-acceptable medical opinion in light of Dr. Malayeri's acceptable medical opinion. However Mr. Marshall testified about his response to the prescribed medication.

> Q: Do you have a therapist there or you talk to a doctor?
>
> A: I talk to a doctor once every two weeks and talk to my therapist every week.
>
> Q: And why are you going – – why did you start going there in the summer of '07?
>
> A: Basically, Your Honor, I, I just couldn't handle it. I, I'm, I'm a [sic] outdoor person, I'm a 12 hour man working and I, and I just can't do nothing, and I got upset I started hollering and screaming, and my fiancée told me that I needed help, and so I went to talk to them.
>
> Q: All right. And do you have any mental medication?
>
> A: Yes, ma'am. I do.
>
> \*     \*     \*

---

[17] *Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies.*

Q:      All right.   And have you had to go to any hospital emergency room, maybe be admitted because you were having mental symptoms?

A:      No, ma'am.

Q:      All right.  And the medications that you're getting do they help with your mental symptoms, do you feel better, worse, about the same?

A:      Yes, ma'am.  They are helping.

Q:      All right.

A:      Just last month – –

Q:      And how are they helping?

A:      They're relaxing me more, – –

Q:      Okay.

A:      – – I don't – – I ain't angry as much, trying to keep a focused mind.

R. at 45-47.

Finally with regard to Plaintiff's assertion that the ALJ failed to recognize Ms. Dudley's opinion that Mr. Marshall's depression can be expected to last at least 12 months, Ms. Dudley developed this opinion after two or three sessions with Mr. Marshall, a short period of time. Ms. Dudley is not an acceptable medical source.  Nevertheless, "[o]pinions from these sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  *SSR 06-03p*, 2006 WL 2329939 at *3.  Other relevant evidence in the file however is lacking regarding the expected duration of Mr. Marshall's depression.

*D.     Failure to Accord Controlling Weight to Dr. Mehta*

Dr. Mehta is Mr. Marshall's primary treating physician and has treated Mr. Marshall since January 27, 2003.   R. at 368.   Plaintiff argues, "[h]aving treated him over an extended period of time, Dr. Mehta was in a superior position from which to assess Mr. Marshall's RFC and his opinion, well supported in the record, should have been given controlling weight."   ECF No. 14-2 at 30.

The ALJ assessed Dr. Mehta's opinion in the decision.

> Vinodrai Mehta, M.D., the claimant's primary care physician, completed a Medical Source Statement on September 4, 2007 (Exhibit 20F).  Dr. Mehta identified the claimant's impairments as insulin dependent diabetes mellitus, hypertension and hyperlipidemia.  Dr. Mehta determined that the claimant could sit for 1 hour, stand for 1 hour, walk for 1 hour, climb for 1 hour or bend for 1 hour but could never squat, reach or crawl.  The claimant could lift less than 10 pounds frequently.  The claimant should avoid all exposure to cold, heat, humidity, chemicals, dust, fumes and odors, noise, and heights.  The claimant could not use his hands to push or perform fine manipulations. . . .Even though Dr. Mehta did not complete the mental portion of the evaluation he opined that the claimant was mildly restricted in his daily activities, moderately restricted in his social functioning and concentration, persistence and pace with three episodes of decompensation.   On June 8, 2007, Dr. Mehta additionally indicated that the claimant has cervical spinal stenosis and had been unable to work since May 1, 2007 (Exhibit 28F).

> *                         *                         *

> The undersigned assigns little weight to Dr. Mehta's opinion (Exhibit 20F).  The undersigned finds Dr. Mehta's conclusions to be inconsistent with the record and determines that Dr. Mehta's lack of expertise in vocational training and occupational health coupled with his specialty in general medicine have not provided a balanced review of the claimant's limitations.

> Dr. Mehta's assessment that the claimant does not have a capacity for work is given little weight because the totality of the

> medical evidence shows the claimant is not as limited as
> determined by Dr. Mehta. The record suggests that Dr. Mehta,
> who does not have a specialization in endocrinology, neurology or
> orthopedics, relied heavily on the claimant's subjective
> complaints regarding his physical impairments to guide his
> completion of the opinion. Further, regardless of Dr. Mehta's
> conclusions about the claimant's disabled status, opinions
> regarding a claimant's ability to work are administrative findings
> and as such are reserved to the Commissioner (SSR 96-5p).

R. at 20-21, 21-22.

The ALJ's assessment is supported by the record. For instance during an emergency room visit of August 15, 2005, Mr. Marshall was examined and found to be alert in no acute distress. R. at 223. Dr. Tuwiner conducted an examination of Mr. Marshall on August 18, 2006. "He was able to get up and down from the exam table, take his shoes on and off without limitations." *Id.* at 278. Dr. Tuwiner observed no abnormalities in Mr. Marshall's coordination/station/gait. Regarding Mr. Marshall's range of motion, "Cervical, dorsal, lumbar, hip joint, ankle joint, knee joint range of motion is normal." *Id.* The straight leg raise was negative both lying and sitting down. The range of motion in Mr. Marshall's shoulder joint, elbow joint, wrist joint and finger joint was normal. However, as the ALJ acknowledged when assigning weight to Dr. Tuwiner's opinion, Mr. Marshall's functional capacity, over time, has not improved. *Id.* at 21.

Post cervical spine surgery, on July 5, 2007, Dr. Wolinsky found Mr. Marshall's strength "is 5 over 5 throughout in both upper extremities, except on the right upper extremity, which his triceps remain at 4 over 5 and his wrist extensors are 4 plus over 5 in his finger extensors are 2 to 1 over 5 on the right upper extremity. His left extremity has remarkably returned to 5 over 5 throughout." *Id.* at 392. By the time of the January 24, 2008 visit, Dr. Wolinsky noted, "He

returns to clinic today and his strength is significantly improved. His strength is 5 over 5 throughout except for his right hand, he has significant contractures of his fingers making it impossible to evaluate." *Id.* at 385.

In addition to the medical evidence, other evidence of record, including Mr. Marshall's testimony, indicates Mr. Marshall is able to take care of most of his personal needs, he prepares simple meals, he drives, he socializes with friends and neighbors and he regularly takes and picks up his stepson from school. In light of all the evidence of record, the ALJ properly declined to accord controlling weight to Dr. Mehta's opinion.

E.    *Combination of Impairments*

Plaintiff argues, although the ALJ "appears to go out of her way to assess each of Mr. Marshall's impairments individually, both severe and non-severe," ECF No. 14-2 at 28, the ALJ failed to consider the cumulative or synergistic effect of Mr. Marshall's multiple severe and non-severe impairments.

At step two the ALJ found as severe impairments — (a) cervical degenerative disc disease, (b) right hand contracture, (c) diabetes mellitus, (d) arthritis of the knee and shoulder and (e) obesity. Further, at step two the ALJ found as non-severe impairments — (a) hypertension, (b) vision loss, (c) depression and (d) headache. The Court finds the ALJ considered the combination of impairments in the subsequent steps of the sequential evaluation process. Mr. Marshall's RFC, as determined by the ALJ, specifically incorporates manipulative limitations because of the right hand contracture, postural limitations because of Mr. Marshall's cervical degenerative disc disease, arthritis of the knee and shoulder and obesity, as well as exertional limitations due to Mr. Marshall's cervical degenerative disc

disease, arthritis of the knee and shoulder and obesity. The evidence of record indicated Mr. Marshall's vision problems were resolved with surgery, his headaches were not an ongoing problem and his hypertension and depression were controlled by medication. The ALJ properly considered the combination of Mr. Marshall's multiple impairments in making her decision.

5.      **Conclusion**.

Substantial evidence supports the decision that Mr. Marshall is not disabled. Accordingly, the Defendant's Motion for Summary Judgment will be granted and Plaintiff's Motion for Summary Judgment will be denied.

Date: <u>December 20, 2011</u>              _____/s/_____
                                                              WILLIAM CONNELLY
                                                              UNITED STATES MAGISTRATE JUDGE